**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

CARL GAMBRELL, MICHAEL HANSON,
ALEXANDER HINKLE, RYAN JONES, JAWAD
KHOUIR, SARMAD MOHAMMED, ZACHARY
MONDRAGON, DOMINIC PELLICANE, and FRITZ
SCHNEIDER, as Class Representatives, on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

MOSES STANCIL, in his official capacity as Executive
Director of the Colorado Department of Corrections;
AMANDA RETTING, in her official capacity as Sex
Offender Treatment and Monitoring Program
Administrator and Department of Corrections
Representative on the Sex Offender Management Board;
and KIMBERLY KLINE, in her official capacity as Chief
of Behavioral Health at the Department of Corrections and
Chair of the Sex Offender Management Board.

      Defendants.

---

**CLASS ACTION COMPLAINT**

---

Plaintiffs bring this class action on behalf of themselves and all others similarly situated

against Moses Stancil, Executive Director of the Colorado Department of Corrections; Amanda

Retting, Sex Offender Treatment and Monitoring Program Administrator and Department of

Corrections Representative on the Sex Offender Management Board; and Kimberly Kline, Chief

of Behavioral Health at the Department of Corrections and Chair of the Sex Offender

Management Board.

## I.    INTRODUCTION

1.     Colorado made an empty promise. It assured individuals convicted of certain sex offenses that, even though they were going to prison for an indeterminate length, once they "successfully progressed" in sex offender treatment through the Department of Corrections' Sex Offender Treatment and Monitoring Program (SOTMP), they would be eligible for parole.

2.     But the Department of Corrections (DOC) refuses to provide the treatment necessary for individuals serving indeterminate sentences to be eligible for parole, foreclosing hundreds of people from being eligible for release.

3.     At the same time, DOC provides that same treatment to high-risk sex offenders, not presently eligible for parole, because they have determinate prison sentences.

4.     In other words, DOC arbitrarily prioritizes treatment solely based on whether an individual has a determinate or indeterminate sentence: if an individual will be released from prison at a date certain based on his determinate sentence, DOC will prioritize him for sex offender treatment. Meanwhile, DOC leaves by the wayside individuals who pose lower risks of recidivism, serving indeterminate sentences for less serious crimes of conviction, with shorter minimum sentences.

5.     Put simply, DOC is not prioritizing access to treatment based on the severity of an individual's crime of conviction, his risk of reoffending, his willingness to participate in treatment, his behavior while incarcerated, his due process liberty interest, or any other relevant and reasonable metric. DOC's refusal to provide treatment to offenders serving indeterminate sentences is arbitrary and capricious.

2

6.　　DOC's refusal to adequately staff its treatment programs only compounds the problem. DOC has not requested additional funding from the Legislature to address its SOTMP staffing shortage; it has no legitimate prioritization system for allowing inmates to receive treatment; and it cannot articulate any rational basis for denying treatment to otherwise parole-eligible individuals.

7.　　Moreover, many of the class members were sentenced under a negotiated agreement with state prosecutors that, either implicitly or explicitly, guaranteed the treatment now being withheld.

8.　　By steadfastly refusing to provide treatment to individuals with indeterminate sentences, Defendants are breaking the law and breaching their promises to Plaintiffs and other members of the Proposed Class. Plaintiffs come to this Court for relief.

## II.　BACKGROUND

9.　　This case arises from DOC's continued failure and refusal to provide statutorily mandated treatment to inmates serving indeterminate sentences under Colorado's Sex Offender Lifetime Supervision Act of 1998 (SOLSA), C.R.S. § 18-1.3-1001 *et seq*. The plain language of the Act mandates that sex offenders "shall be required as part of the sentence to undergo treatment" and will not be released on parole until they have "successfully progressed in treatment." C.R.S. §§ 18-1.3-1004(3); 18-1.3-1006(1)(a). Participation in sex offender treatment is a condition precedent to being eligible for parole.

10.　　Plaintiffs are inmates in the custody of DOC serving indeterminate sentences at Fremont Correctional Facility, Buena Vista Correctional Complex, and other locations. Plaintiffs

were convicted of offenses arising under SOLSA and are thus entitled to receive, and must progress in, the statutorily mandated treatment to be eligible for parole.

11.     Despite the clear statutory mandate that DOC must provide Plaintiffs with SOTMP treatment, DOC arbitrarily and capriciously denies Plaintiffs the opportunity to do so, thereby denying Plaintiffs the opportunity to be considered for parole. This deprivation of treatment results in a de facto lifetime prison sentence for all sex offenders in Colorado with indeterminate sentences. This is the unlawful result of Defendants' conduct.

12.     First, for inmates lacking severe medical and psychiatric issues, Defendants offer SOTMP treatment at just two facilities—Fremont Correctional Facility and Territorial Correctional Facility. Defendants refuse to transfer inmates to these two facilities to obtain treatment before their parole eligibility date. Even when an inmate is eventually transferred, DOC will not provide treatment until a spot in the treatment group becomes available, which DOC prioritizes for inmates serving determinate rather than indeterminate sentences.

13.     Second, Defendants offer treatment based on an arbitrary system. Defendants cannot explain why eligible individuals are not receiving treatment, other than to note they cannot provide it. As for their staffing vacancies, Defendants have lamented their own failure to hire the appropriate number of treatment staff for decades, but there are obvious and simple solutions to DOC's claimed staffing issue that Defendants refuse to implement—(1) permitting telehealth services, (2) permitting private treatment providers to deliver treatment within the facilities, or (3) changing the treatment facilities to the Denver or Colorado Springs Metropolitan Areas. Any one of these options would increase the number of providers available to offer timely SOTMP treatment. So bad is the situation that, in 2023, the General Assembly mandated DOC to

propose tangible solutions to the problem. C.R.S. § 16-11.7-105. Despite that statutory mandate, DOC failed to act. *See generally* Christopher Lobanov-Rostovsky, et al., *Sex Offender Management Board (SOMB)/Department of Corrections (DOC) Treatment Solutions Work Group Report* (Feb. 1, 2024), https://leg.colorado.gov/sites/default/files/images/2024-02-01_somb-doc_treatment_solutions_work_group_final_report_0.pdf

14.     Third, Defendants do not require that treatment be conducted in a manner endorsed by the American Psychological Association, Association for the Treatment and Prevention of Sexual Abuse (ATSA), or the core correctional principles of risk-need-responsivity (RNR), which have been explicitly adopted in statute, *see, e.g.*, C.R.S. § 16-11.7-103(4)(b). Instead, Defendants impose conditions on potential treatment providers that effectively, conveniently, and arbitrarily preclude them from providing treatment.

15.     Finally, SOTMP is grossly understaffed, with twenty-six vacant therapist positions of the forty-one required and a current fifty-three-percent vacancy rate for SOTMP staff overall. Aside from "recruiting" at the Colorado State Fair, the Broadmoor World Arena, and local community events, Defendants have failed to redress this problem through other available solutions described herein.

16.     Meanwhile, the Colorado Board of Parole's official policy is that any person serving an indeterminate sentence "will be required to have successfully progressed in treatment in order to be considered for parole." As a result, although the Parole Board has general discretion to release individuals following their parole eligibility date, it cannot exercise that discretion if the individual is serving an indeterminate sentence and has not yet received

5

treatment, regardless of their risk level, the wishes of any victims, or the nature of the sexual offense conviction or probation or parole violation that resulted in a SOLSA DOC sentence.

17.     The same is *not* true for individuals serving determinate sentences, who must be paroled when they reach their mandatory release date even if they haven't started or progressed in treatment, even if their crimes of conviction are more serious, and even if they pose a higher risk of re-offending.

18.     This cruel, irrational, and avoidable circumstance deprives inmates like Plaintiffs of constitutionally protected interests, and it unnecessarily burdens our State with tens of millions of dollars in annual costs for warehousing individuals otherwise eligible for release on parole. Indeed, last year alone, Defendants' refusal to provide SOTMP treatment before these inmates' parole eligibility date cost Colorado taxpayers approximately $91.4 million.

19.     Moreover, Defendants' failure to provide treatment, and the arbitrary manner in which Defendants prioritize and select inmates for treatment, dramatically impacts the mental and physical health of the effected inmates. Apart from the harm to the inmates themselves, their families have been irreparably broken because of Defendants' refusal to provide timely access to SOTMP treatment. Children wait for their parents to come home; birthdays, funerals, weddings, graduations, and all the fabric of life in between is lost while Plaintiffs unnecessarily languish in prison because Defendants will not provide them the promised and mandated treatment.

20.     Plaintiffs have been routinely assaulted and threatened by other inmates. They suffer from anxiety, depression, and other illnesses attributable to their status, the arbitrary nature of their confinement, and the uncertainty about their future. Change is desperately needed.

## III.   PARTIES

21.     At all times relevant to the allegations in this Complaint, Plaintiffs are imprisoned in the Colorado DOC including Fremont Correctional Facility in Fremont County, Colorado, Colorado Territorial Correctional Facility, in Fremont County, Colorado, and Buena Vista Correctional Complex in Chaffee County, Colorado.

22.     At all times relevant to the allegations in this Complaint, Defendant Moses Stancil was a citizen of the United States, a resident of and domiciled in the State of Colorado, and was acting under color of state law in his capacity as the Executive Director of DOC.

23.     At all times relevant to this action, Defendant Amanda Retting was a citizen of the United States, a resident of and domiciled in the State of Colorado, and acting under color of state law in her capacity as DOC's SOTMP Administrator, and Representative on the Sex Offender Management Board (SOMB).

24.     At all times relevant to this action, Defendant Kimberly Kline was a citizen of the United States, a resident of and domiciled in the State of Colorado, and acting under color of state law in her capacity as the Chief of Behavioral Health at DOC and Chair of the SOMB.

## IV.   JURISDICTION AND VENUE

25.     This action arises under the Constitution and the laws of the United States, including Article III, Section 1 of the U.S. Constitution and 42 U.S.C. §§ 1983, 1988. This Court has the authority to grant the declaratory and injunctive relief requested herein pursuant to 28 U.S.C. §§ 2201 – 2202. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343.

26.     Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391.

## V.     FACTS

### A.     The Department of Corrections

27.     DOC is a state institution established by Article VIII, Section 1 of the Colorado Constitution. Under C.R.S. § 17-1-101, the governor, subject to consent of the state senate, appoints DOC's executive director.

28.     Administration of the DOC is, in theory, under various laws located in Title 17, Section 1 of the Colorado Revised Statutes, "Corrections." *See* C.R.S. § 17-1-101 *et seq*.

29.     DOC operates the following twenty-one prisons consistent with C.R.S. § 17-1-104.3(1)(b):

| **Correctional Facility** | **Location** | **Security level** |
|---|---|---|
| Colorado State Penitentiary | Fremont County | Level V |
| Centennial Correctional Facility | Fremont County | Level V |
| Limon Correctional Facility | Lincoln County | Level IV |
| Arkansas Valley Correctional Facility | Crowley County | Level III |
| Buena Vista Correctional Complex | Chaffee County | Level III |
| Colorado Territorial Correctional Facility | Fremont County | Level III |

| | | |
|---|---|---|
| Fremont Correctional Facility | Fremont County | Level III |
| Arrowhead Correctional Center | Fremont County | Level II |
| Four Mile Correctional Center | Fremont County | Level II |
| Skyline Correctional Center | Fremont County | Level I |
| Colorado Correctional Center | Jefferson County | Level I |
| Delta Correctional Center | Delta County | Level I |
| Rifle Correctional Center | Garfield County | Level I |
| Colorado Correctional Alternative Program | Chaffee County | Level I |
| Denver Reception and Diagnostic Center | City and County of Denver | Level V |
| La Vista Correctional Facility | Pueblo County | Level III |
| San Carlos Correctional Facility | Pueblo County | Level V |
| Sterling Correctional Facility | Logan County | Level V |
| Trinidad Correctional Facility | Las Animas County | Level II |
| Denver Women's Correctional Facility | City and County of Denver | Level V |
| Youthful Offender System | Pueblo County | Level III |

30.     As a practical matter, however, SOTMP treatment is offered to neurotypical, adult male inmates at only two of these prisons: Fremont Correctional Facility and Territorial Correctional Facility. As of November 2023, Fremont Correctional Facility houses all three SOTMP Treatment Tracks, reflecting all risk levels.

31.     Defendants have limited the facilities where SOTMP can be offered by arbitrarily classifying inmates as "S5"—an individual that Defendants have determined to need offense-specific treatment—and triggering unnecessarily higher facility security assignment classifications.

32.     Defendants have also acted with indifference to SOTMP capacity limits by referring almost 25% of the state prison population to SOTMP, even when such individuals are not "sex offenders" for purposes of the SOMB. *See, e.g.,* C.R.S. § 16-11.7-102(2)(a)(IV).

33.     Although C.R.S. § 16-11.7-102(2)(a) was updated in in June 2023 to make clear that a person with a prior conviction or adjudication for a sex offense that is now being sentenced for a non-sex crime is *not* a "sex offender" unless a court makes specific findings, Defendants have failed to update DOC Administrative Regulation (AR) 700-19 to reflect this change in law, refuse to enforce the statutory definition, and continue to refer individuals to SOTMP treatment who are neither "sex offenders" nor statutorily required to participate in sex offender treatment.[1]

---

[1] Defendants lack any basis for requiring non-sex offenders, who fall outside the statutory definition in C.R.S. § 16-11.7-102(2), to undergo sex offender treatment.

34.     To the contrary, Defendants updated AR 700-19 effective May 1, 2024, but retained a narrow definition of "sex offender" that does not match the revised statutory definition adopted in June 2023. AR 700-19, § (III)(C) (effective May 1, 2024).

35.     Defendants' decision on this point is all the more shocking because Defendants refuse to provide treatment to the subset of SOLSA-sentenced sex offenders who are ready, willing, and needing such treatment to be eligible for parole.

**B.      The Class Representatives**

36.     Plaintiff Carl Gambrell is incarcerated at DOC's Territorial Correctional Facility. He was convicted of a sex offense under SOLSA, C.R.S. § 18-1.3-1001 *et seq.*, in Arapahoe County, Colorado, Case No. 17CR1811, and sentenced to an indeterminate sentence of four-years-to-life under C.R.S. § 18-1.3-1004(1)(a). He entered DOC custody on March 6, 2020, and had a parole eligibility date of October 25, 2022. Given the nature of Plaintiff's sentence and the plain language of SOLSA, sex offender treatment is mandatory for Plaintiff. Plaintiff Gambrell filed his step one, two, and three grievances requesting that he be provided treatment as required, and has exhausted any administrative remedy available. DOC has denied Mr. Gambrell any relief. Because DOC will not provide Mr. Gambrell with treatment, DOC will not parole him even though he is otherwise eligible for release.

37.     Plaintiff Michael Hanson is incarcerated at DOC's Fremont Correctional Facility. He was convicted of a sex offense under SOLSA, C.R.S. § 18-1.3-1001 *et seq.*, in Jefferson County, Colorado, Case No. 18CR2093, and sentenced to an indeterminate sentence of three-years-to-life under C.R.S. § 18-1.3-1004(1)(a). He entered DOC custody on October 22, 2019, and had a parole eligibility date of December 25, 2021. Given the nature of Plaintiff's sentence

11

and the plain language of SOLSA, sex offender treatment is mandatory for Plaintiff. Plaintiff Hason filed his step one, two, and three grievances requesting that he be provided treatment as required, and has exhausted any administrative remedy available. DOC has denied Mr. Hanson any relief, and has told Mr. Hanson, essentially, that because DOC has limited resources it cannot provide him with the mandatory treatment. Because DOC will not provide Mr. Hanson with treatment, DOC will not parole him even though he is otherwise eligible for release.

38.     Plaintiff Alexander Hinkle is incarcerated at DOC's Territorial Correctional Facility. He entered into a plea agreement to a sex offense under SOLSA, C.R.S. § 18-1.3-1001 *et seq.*, in El Paso County, Colorado, Case No. 19CR64, and sentenced to an indeterminate sentence of two-years-to-life under C.R.S. § 18-1.3-1004(1)(a). He entered DOC custody on November 23, 2021, and had a parole eligibility date of September 10, 2022. Given the nature of Plaintiff's sentence and the plain language of SOLSA, sex offender treatment is mandatory for Plaintiff. Plaintiff Hinkle has filed a Step 1 and Step 2 grievance, both of which were denied. His Step 3 grievance is pending. DOC has denied Mr. Hinkle any relief. Because DOC will not provide Mr. Hinkle with treatment, DOC will not parole him even though he is otherwise eligible for release.

39.     Plaintiff Ryan Jones is incarcerated at DOC's Fremont Correctional Facility. He was convicted of a sex offense under SOLSA, C.R.S. § 18-1.3-1001 *et seq.*, in Boulder County, Colorado, Case No. 17CR1438, and sentenced to an indeterminate sentence of four-years-to-life under C.R.S. § 18-1.3-1004(1)(a). He entered DOC custody on March 29, 2019, and had a parole eligibility date of February 3, 2022. Given the nature of Plaintiff's sentence and the plain language of SOLSA, sex offender treatment is mandatory for Plaintiff. Plaintiff Jones filed his

step one and two grievances requesting that he be provided treatment as required. DOC has denied Mr. Jones any relief, and has told Mr. Jones that because DOC has limited resources it cannot provide him with the mandatory treatment. Because DOC will not provide Mr. Jones with treatment, DOC will not parole him even though he is otherwise eligible for release.

40.     Plaintiff Jawad Khouir is incarcerated at DOC's Fremont Correctional Facility. He was convicted of a sex offense under SOLSA, C.R.S. § 18-1.3-1001 *et seq.*, in Boulder County, Colorado, Case No. 11CR859, and sentenced to an indeterminate sentence of twelve-years-to-life under C.R.S. § 18-1.3-1004(1)(a). He entered DOC custody on May 29, 2013, and had a parole eligibility date of February 25, 2023. Given the nature of Plaintiff's sentence and the plain language of SOLSA, sex offender treatment is mandatory for Plaintiff. He filed his step one grievance requesting that he be provided treatment as required. When DOC inevitably denies that grievance, Mr. Khouir will file step two and step three grievances. DOC has denied Mr. Khouir any relief, and has told Mr. Khouir, essentially, that because DOC has limited resources it cannot provide him with the mandatory treatment. Because DOC will not provide Mr. Khouir with treatment, DOC will not parole him even though he is otherwise eligible for release.

41.     Plaintiff Sarmad Mohammed is incarcerated at DOC's Fremont Correctional Facility. He was convicted of a sex offense under SOLSA, C.R.S. § 18-1.3-1001 *et seq.*, in El Paso County, Colorado, Case No. 12CR2925, and sentenced to an indeterminate sentence of twelve-years-to-life under C.R.S. § 18-1.3-1004(1)(a). He entered DOC custody on September 16, 2013, and had a parole eligibility date of February 11, 2022. Given the nature of Plaintiff's sentence and the plain language of SOLSA, sex offender treatment is mandatory for Plaintiff. He filed his step one grievance requesting that he be provided treatment as required. When DOC

inevitably denies that grievance, Mr. Mohammed will file step two and step three grievances. DOC has denied Mr. Mohammed any relief, and has told Mr. Mohammed, essentially, that because DOC has limited resources it cannot provide him with the mandatory treatment. Because DOC will not provide Mr. Khouir with treatment, DOC will not parole him even though he is otherwise eligible for release.

42.      Plaintiff Zachary Mondragon is incarcerated at DOC's Buena Vista Correctional Complex. He was convicted of a sex offense under SOLSA, C.R.S. § 18-1.3-1001 *et seq.*, in Denver County, Colorado, Case No. 07CR1287, and sentenced to an indeterminate sentence of twenty-years-to-life under C.R.S. § 18-1.3-1004(1)(a) on March 14, 2008, with a parole eligibility date of March 18, 2023. Under his sentence, sex offender treatment is mandatory before Mr. Mondragon is eligible for parole. Plaintiff Mondragon filed his step one, two, and three grievances requesting that he be provided treatment as required, and he has exhausted any administrative remedy available. Mr. Mondragon was denied parole in March 2023 and January 2024. Because DOC will not provide Mr. Mondragon with treatment, DOC will not parole him even though he is otherwise eligible for release.

43.      Plaintiff Dominic Pellicane is incarcerated at DOC's Fremont Correctional Facility. He was convicted of a sex offense under SOLSA, C.R.S. § 18-1.3-1001 *et seq.*, in Jefferson County, Colorado, Case No. 18CR131, and sentenced to an indeterminate sentence of six-years-to-life under C.R.S. § 18-1.3-1004(1)(a). He entered DOC custody on December 13, 2019, and had a parole eligibility date of December 21, 2023. Given the nature of Plaintiff's sentence and the plain language of SOLSA, sex offender treatment is mandatory. Plaintiff Pellicane filed his step one, two, and three grievances requesting that he be provided treatment as

14

required, and has exhausted any administrative remedy available. DOC has denied Mr. Pellicane any relief, and has told Mr. Pellicane, essentially, that because DOC has limited resources it cannot provide the treatment. Because DOC will not provide Mr. Pellicane with treatment, DOC will not parole him even though he is otherwise eligible for release.

44.     Plaintiff Fritz Schneider is incarcerated at DOC's Fremont Correctional Facility. He was convicted of a sex offense under SOLSA, C.R.S. § 18-1.3-1001 *et seq.*, in Chaffee County, Colorado, Case No. 09CR153, and sentenced to an indeterminate sentence of ten-years-to-life under C.R.S. § 18-1.3-1004(1)(a). He entered DOC custody on November 17, 2011, and had a parole eligibility date March 9, 2022. Given the nature of Plaintiff's sentence and the plain language of SOLSA, sex offender treatment is mandatory for Plaintiff. Plaintiff Schneider filed his step one, two, and three grievances requesting that he be provided treatment as required, and has exhausted any administrative remedy available. DOC has denied Mr. Schneider any relief, and has told Mr. Schneider that because DOC has limited resources it cannot provide him with the mandatory treatment. Because DOC will not provide Mr. Schneider with treatment, DOC will not parole him even though he is otherwise eligible for release.

45.     All Plaintiffs are classified as "S5R," which means that according to Defendants' own criteria, they are eligible and ready for treatment.

## C.     The Class Representatives Have Exhausted Administrative Remedies or Administrative Remedies Are Unavailable

46.     DOC has a three-step administrative procedure purportedly in place for inmates to resolve complaints about their treatment. Some class members have attempted to resolve the failure of DOC to provide treatment through the grievance process. But the administrative

procedure is unavailable because it operates as a simple dead end, with Defendants unable or consistently unwilling to provide any relief to aggrieved inmates. Moreover, DOC has repeatedly denied step one, two, and three grievances filed by inmates, like Plaintiffs, and those similarly situated. Failing to provide treatment has been the subject of multiple federal lawsuits. In each case, DOC has denied any responsibility or liability for its failure to provide the mandatory treatment, evidencing a clear policy of categorical denial. Under these circumstances, attempts to use the DOC grievance process for the issue raised by Plaintiffs is, and would be, an exercise in futility.[2]

47.    Plaintiffs have thus exhausted all available administrative remedies.

48.    Although Plaintiffs are ready, willing, and able to do the necessary work to ensure they can be safely released into the community, treatment has been unavailable to Plaintiffs and other individuals sentenced to indeterminate sentences under SOLSA.

---

[2] "[A] narrow exception to the exhaustion requirement applies if a petitioner can demonstrate that exhaustion is futile." *King v. Ciolli*, No. 1:23-CV-00519-CNS, 2023 WL 2933405, at *3 (D. Colo. Apr. 13, 2023), *opinion clarified*, No. 1:23-CV-00519-CNS, 2023 WL 3963614 (D. Colo. May 10, 2023), *vacated and remanded*, No. 23-1201, 2024 WL 1179908 (10th Cir. Mar. 19, 2024).

> The futility exception generally applies when administrative relief is effectively foreclosed. This may occur in two situations: (1) for another inmate's same grievance, there has been an adverse decision disposing of the precise issue raised by the petitioner, or (2) other inmates' same grievances have been met with a "policy of categorical denial.

*Id.* (quotations and citations omitted).

**D.      DOC's Sex Offender Treatment and Maintenance Program**

49.      In creating SOLSA, the Colorado Legislature explicitly found "that keeping all sex offenders in lifetime incarceration imposes an unacceptably high cost in both state dollars and loss of human potential." C.R.S. § 18-1.3-1001. To this end, the legislature declared that individuals convicted of certain sex offenses must "receive treatment and supervision," and it provided several mechanisms by which treatment and supervision can occur. *See id.*

50.      SOLSA further establishes the statutory framework for lifetime supervision of sex offenders, and expressly mandates treatment for sex offenders with indeterminate sentences. *See* C.R.S. § 18-1.3-1004(3) ( "Each sex offender sentenced pursuant to this section shall be required as part of the sentence to undergo treatment to the extent appropriate" under law.).

51.      Before enacting SOLSA, the Legislature created the Sex Offender Treatment Board (later renamed the SOMB), initially composed of twelve members. The SOMB is tasked with developing mandatory standards for the treatment of individuals convicted of certain sex crimes. Since it was first created in 1992, the SOMB has grown to twenty-five members who, as required by C.R.S. § 16-11.7-103, represent courts and probation, DOC and parole, county administrations, state governmental agencies, prosecuting and defense attorneys, victim advocates, polygraph examiners, and mental health therapists.

52.      As required by SOLSA, and mandated in the SOMB's enabling statutes, C.R.S. §§ 16-11.7-105 – 106, DOC offers SOMB-compliant treatment through the SOTMP, as noted above.

E.     **SOTMP Risk Classifications**

53.     When individuals with current or historical adult convictions or juvenile adjudications for sex crimes first enter DOC, they are automatically classified as S5 and referred to SOTMP, per AR 700-19.

54.     Further assessments by staff at the DOC's Denver Reception and Diagnostic Center assign an inmate a qualifier as outlined in AR 700-19. Relevant here, qualifiers include "R-Ready" for offenders who presently meet SOTMP participation requirements; these individuals are ready for offense specific sex offender treatment.[3]

55.     Those classified S5-R are placed on the "Global Referral List" (GRL), which is effectively the master list for individuals needing sex offender treatment who are within four years of their Parole Eligibility Date (PED). The four-years-to-PED requirement has no basis in law and is an arbitrary resource prioritization decision of the DOC. There are no women on the GRL.

56.     Given Defendants' refusal to provide timely access to treatment, many individuals have sued Defendants. Those who have successfully progressed in their civil lawsuits against Defendants (such as by surviving a motion to dismiss) are "miraculously" placed into SOTMP at

---

[3] There are several other qualifiers, including "P-Pending" for those who meet requirements but have been previously terminated, removed for cause, dropped out of treatment, or refused SOTMP placement; "D-Does Not Meet Criteria" for people who do not meet participation requirements; and "I-Ineligible" for offenders who have more than four years of their parole eligibility date. Each individual is labeled as "S5-R" or "S5-I," as appropriate. Some qualifiers are subject to adjustment during the prison sentence. With the May 1, 2024, version of AR 700-19, DOC added even more qualifiers. AR 700-19, § (IV)(C)(1)-(14).

Notably, these qualifiers are an extension of DOC's arbitrary and capricious conduct because the decisions as to what label to assign an inmate is not standardized or objective.

an accelerated rate. After placement in SOTMP, Defendants, or the parties, move to dismiss these lawsuits. Meanwhile, others on the GRL, who may lack the ability or means to advocate for themselves (such as by hiring private counsel, speaking and writing in fluent English, and holding U.S. citizenship), continue to languish in prison without treatment. But the fundamental problems thus remain unredressed, remedied (if at all) case-by-case.

57.     For purposes of this Complaint, Plaintiff and other proposed class members are men who have been sentenced under SOLSA to indeterminate lifetime sentences, who are required to receive SOTMP treatment, and who are S5-Ready for treatment but denied access to it.

### F.      The Track System

58.     Apart from its initial risk classification "system," DOC also has a system for assigning the *type* of treatment an individual will receive, known as the "Track" system.

59.     Track I is for very low to below-average risk males and includes cognitive behavioral therapeutic groups based on the evidence-based risk-need-responsivity (RNR) model focusing on the common problem areas of sex offenders.

60.     Track II is for average and well above average individuals.

61.     Track III (one of DOC's newest creations, implemented in November 2023) is for above average to well above-average risk men.

62.     Although RNR principles demonstrate the greatest reduction in sexual recidivism when lower risk individuals receive minimal (or no) sex offender treatment and high-risk individuals receive longer and more intensive treatment, in Fiscal Year 2023 (July 1, 2022 through June 30, 2023), Defendants reported that inmates in the lowest risk track (Track I) spent

an average of thirteen months in SOTMP treatment, while inmates in the highest risk track (Track III) spent an average of 15 months.[4] Thus, there is no functional difference in the treatment duration periods between these Tracks, further evidencing Defendants' arbitrary and capricious approach.

63.     Moreover, men serving indeterminate sentences on the GRL are not evenly distributed between the three tracks: as of July 31, 2023, approximately 11% of indeterminate offenders are classified as very low risk and 30% are below-average risk. Meanwhile, 44% of individuals serving indeterminate sentences are classified as average risk, 10% are above-average risk, and 4% are well-above average risk.

64.     In other words, nearly all indeterminate offenders are in the lower risk Track I or Track II treatment tracks, yet Defendants have not prioritized access to these Tracks despite their great demand. And if SOTMP treatment followed existing research, such individuals would complete treatment in less time than those in Track III.

65.     By comparison, just 3% of individuals serving determinate sentences are very low risk, 15% are below-average risk, 37% are average risk, 23% are above average risk, and 12% are well-above average risk:

---

[4] By contrast, the Minnesota DOC discharges their highest risk population from sex offense specific treatment after approximately nine months.



*See* SOMB 2024 *Treatment Solutions Work Group Report*, p. 12 ("Figure 2. Determinate And Indeterminate By Static 99 Risk Level").

66.     Although minimized by Defendants and the SOMB in their communications with the legislature, the real numbers behind these percentages reveal that individuals serving indeterminate sentences are even less numerous and lower risk than those with a determinate sentence:



*See* SOMB/DOC Treatment Solutions Committee, Presentation, p 8 (August 30, 2023).

67.     Apart from revealing that most individuals serving indeterminate sentences are low-risk and are on Track I or Track II, these figures show that individuals serving determinate sentences are much more likely to recidivate than individuals serving indeterminate sentences. Because SOLSA ignores relative risk and any responsible use of finite SOTMP resources, the individuals serving determinate sentences who are not required to do SOTMP to be eligible for parole are often prioritized over Plaintiffs in accessing SOTMP, and released from prison more quickly than the lower risk cohort that Plaintiffs represent.

68.     DOC claims to provide Track-based treatment at the following locations:

| Facility | Treatment Offered |
|----------|-------------------|
| Fremont Correctional Facility | Tracks I, II, and III |
| Centennial Correctional Facility | Track III |
| Denver Reception and Diagnostic Center | Track II and III for a small group of clients. |
| Denver Women's Correctional Facility | Offers treatment for women. |
| Colorado Territorial Correctional Facility | All tracks for IDD/DD/medical needs clients. |
| San Carlos Correctional Facility | All tracks for those who are seriously mentally ill. |
| Youthful Offender Services | Provides offense specific treatment to children prosecuted as adults who are not sentenced indefinitely under the Lifetime Supervision Act. |

*See* SOMB 2024 *Treatment Solutions Work Group Report*, p. 15 ("SOTMP Track by DOC Facility").

69.     As shown, there are just two facilities in Colorado—out of twenty-one prisons—that provides Track I and II treatment for non-medical male inmates (male individuals lacking significant health or psychiatric issues): Fremont Correctional Facility and Territorial Correctional Facility. Thus, for the vast majority of individuals, it is impossible to get treatment

until they are transferred to Fremont Correctional Facility and later prioritized on the GRL for treatment.

70.     Even where the classes are offered, they are regularly cancelled for several reasons, or no reason at all. For example, classes at Fremont Correctional Facility were cancelled when keys were misplaced resulting in a lockdown. At the same time, however, the garbage can "factory," which produces money for DOC based on inmate labor, kept running.

**G.     The Global Referral List**

71.     Another piece in DOC's treatment puzzle is the GRL, a master list of offenders eligible to obtain treatment. The list is purportedly organized in order of priority based on the factors in AR 700-19, which states:

1.     Offenders with a judicial adjudication of a sex crime that are within four years of their parole eligibility date are prioritized for sex offense specific treatment based upon, but not limited to, the following:

    a.     Parole eligibility date;

    b.     Risk for sexual recidivism;

    c.     Prior SOTMP treatment opportunities;

    d.     Institutional behavior;

    e.     Ancillary treatment needs e.g. mental health, substance use disorder treatment.

AR 700-19, § (IV)(F)(1)(a)-(e) (effective May 1, 2024).

72.     In reality, though, DOC's "prioritization" of offenders on the GRL is completely arbitrary. Defendants do not know, and cannot explain, how any inmate is prioritized on the GRL based on the criteria in AR 700-19, § (IV)(F)(1), which also fails to articulate when and how people with indeterminate versus determinate sentences are prioritized.

24

73.     To be sure, Defendants know, for example, that there are individuals on the GRL with a history of poor institutional behavior that may cause them to be placed further down on the list. Defendants similarly also know that some offenders may have previously successfully participated in community SOMB, SOTMP, or similar treatment before their current sentence to incarceration. But Defendants do not know how these factors are weighed, by whom, and for which inmate, resulting in a completely arbitrary prioritization system. As one SOLSA-sentenced man explained, "[t]he global list changes so drastically and randomly that no one really knows where someone is at within that list. I personally went from 678 to 71 in a period of 3 weeks. That's impossible any way you look at it."

74.     Indeed, for inmates with indeterminate sentences, such as Plaintiffs, the GRL functions to deny them treatment indefinitely.

75.     There are many factors within Defendants' control that cause the arbitrary imposition of *de facto* life sentences on inmates like Plaintiffs: DOC refuses to properly fund or staff SOTMP; it refuses to provide treatment anywhere but two facilities; treatment locations are in remote and/or undesirable locations from a provider's standpoint; many community providers who would be willing to provide telehealth therapy do not want to physically enter a prison to deliver treatment because they feel unsafe and do not consider it a therapeutic environment; DOC refuses to permit telehealth; DOC refuses to permit Plaintiffs to hire privately-funded treatment providers to expand treatment availability through provision of additional individual or group treatment; DOC has and continues to deny inmates opportunities to hire community SOMB treatment providers to deliver treatment in person behind the walls; DOC refuses to move inmates to facilities where treatment is available; it refuses to provide transparency in its

management of the GRL; and DOC refuses to fairly and consistently "prioritize" the GRL as required by AR 700-19, § (IV)(F)(1) or in a manner consistent with its statutory obligations under SOLSA and C.R.S. §§ 16-11.7-102, 104, and 105 (requiring an individualized assessment by an SOMB-approved evaluator to determine for each "sex offender" whether they should be required to participate in SOMB treatment at all and, only if so, what dosage of SOMB treatment is "to the extent appropriate" for that Plaintiff).

### H.    Forever Cut in Line

76.    As stated, Defendants' refusal to provide Plaintiffs treatment partly results from DOC's refusal to dedicate resources sufficient to ensure that all inmates who require and are eligible to receive treatment can access it. And because DOC limits the availability of treatment, it prioritizes sex offenders with determinate sentences—who have a mandatory release date—over individuals, like Plaintiffs, who are serving indeterminate sentences. This "cutting in line" process happens over and over, denying Plaintiffs access to treatment and preventing their release.

77.    DOC's allocation of access to SOTMP beds does not reflect Plaintiffs' due process interest in SOTMP so that they can "progress in treatment" and become eligible for parole. Rather, DOC repeatedly chooses to populate the GRL with individuals serving determinate sentences. And with no public safety rationale, Colorado continues to mandate (typically long-delayed) treatment for the lower risk cohort of people sentenced under SOLSA while releasing higher risk people with determinate sentences when the clock runs out. As one SOMB Board Member noted on January 19, 2024: "35% of the people who are waiting for SOTMP are above average or well above average risk on determinate sentences. Those people

are the most dangerous sex offenders that DOC has and they're going to get out without treatment." At the same time, this SOMB Board Member noted that 41% of inmates on the GRL are "below average or low risk" who "are just sitting there on indeterminate sentences."

78.     Put another way, DOC places determinate offenders at the top of the GRL because they will otherwise be paroled prior to receiving treatment, causing low-risk inmates serving indeterminate sentences (including Plaintiffs) to languish in prison without treatment. And there is no end to this problem as new determinate inmates enter prison and the GRL continues to grow. About eighty new S5's are added to the prison population *every month* while Defendants told the General Assembly's Joint Budget Committee in December 2023 that they can only successfully discharge **160** S5's from SOTMP *each year.* In 2016, State Auditors concluded that if no one new was added to the GRL at that time, it would take DOC eight years to eliminate the GRL.

### I.     The Wait Is Getting Longer

79.     In 2023, DOC admitted an average of sixty-nine new S5 inmates into its prisons per month, for a total of 828 people referred to the SOTMP program (all of which are S5 admissions). On the other hand, the program graduated 13.3 inmates per month (160 yearly), leaving a backlog five times the size in just one year.

80.     DOC's inability to provide treatment even to those it deems high priority confirms that inmates with indeterminate sentences can never improve their position on the GRL.

81.     DOC also does not provide periodic reviews of an inmate's position on the GRL, does not consistently assign placements on the GRL, and refuses to allow inmates to discern their own placement on the GRL. In turn, an inmate cannot know or dispute their position on the

GRL, although it directly impacts their liberty and ability to persuasively advocate for relief from the judiciary.

82.     In fact, it appears that DOC prioritizes individuals for treatment based on criteria unrelated to its statutory obligations or any legitimate penological interests. DOC also incorporates considerations well beyond the representations in AR 700-19, such as—but not limited to—attempts to moot civil litigation by accelerating the SOTMP enrollment of such plaintiffs ahead of other SOLSA inmates with a liberty interest in SOTMP.

83.     At all times relevant to this action, admittance to the SOTMP was limited so that at least 200 inmates sentenced under SOLSA, including Plaintiffs, have been unable to obtain any measure of treatment and will therefore remain in DOC custody indefinitely.

**J.     DOC's Failure to Hire Treatment Providers**

84.     The real reasons why DOC has failed or refused to retain enough treatment providers to meet its statutory obligations are unclear. DOC has not asserted it lacks sufficient funding. Instead, it has claimed (for decades) that it cannot fill provider positions to provide sufficient treatment.

85.     DOC claims that it has tried to fill these positions by recruiting at career fairs, advertising at the Broadmoor Word Arena, and handing brochures at the Colorado State Fair. DOC has not explained how or why these efforts are enough to attract credentialed, SOMB-approved sex offender treatment providers. Notably absent from these efforts is targeted recruiting of higher educational institutions.

86.      DOC recognizes that most providers live in the Denver Metro Area, and yet the only facilities providing Tracks I, II, and III treatment are hours away:



Department of Corrections, *Lifetime Supervision of Sex Offenders Annual Report,* 30 ("Figure 8.
Number of and Location of SOMB Adult Treatment Providers by County, June 30, 2023")
https://www.courts.state.co.us/userfiles/file/Administration/Probation/LifetimeReport/FY2023-
Lifetime-Supervision-of-Sex-Offenders-Annual-Report-FINAL.pdf.

87.     It is simply unacceptable for DOC to allow low-risk, parole-eligible individuals,
who are willing and able to receive treatment, to remain in prison because of a so-called "staffing
problem" that has persisted for decades. DOC has sought no legislative remedy for a statutory
mandate it has failed to adequately implement at all times since November 1, 1998, SOLSA's
effective date. DOC is refusing to adequately fund, staff, prioritize, and provide required
treatment to eligible individuals, keeping them locked in prison at the individual's and taxpayers'
expense.

### K.     DOC's Failure to Provide Treatment

88.     The primary purpose of providing mental health and behavioral treatment programs for convicted sex offenders is to reduce recidivism. To that end, the SOMB is tasked with identifying and requiring best practices for treating and managing sex offenders, including the use of evidence-based analysis of treatment standards and programs.

89.     Evidence-based practice is encouraged by the American Psychological Association (APA)—the nation's largest professional organization for psychology—in its official policy. The APA states that the "purpose of [evidence-based practice] is to promote effective psychological practice and enhance public health by applying empirically supported principles of psychological assessment, case formulation, therapeutic relationship, and intervention." American Psychological Association, *Evidence-Based Practice in Psychology*, 61(4) American Psychologist 271, 273 (2006) (https://www.apa.org/pubs/journals/features/evidence-based-statement.pdf). The SOMB, in turn, has a statutory mandate to implement evidence-based practices in its treatment standards. *See* § 16-11.7-103(4)(b). The SOTMP purports to provide comprehensive assessment, evaluation, treatment, and monitoring services to sex offenders motivated to eliminate sexual abuse behaviors. But that is not the case for individuals serving indeterminate sentences.

90.     And yet, another factor giving rise to the impossible backlog of inmates awaiting treatment is DOC's arbitrary refusal to allow treatment to be administered remotely (such as by telehealth services which are authorized by the SOMB) or by privately hired therapists. Instead, DOC requires treatment providers to be physically present in a DOC facility to treat inmates. It also refuses to allow privately funded treatment, even if the provider is SOMB-approved and

physically present at the facility. Defendants' position on this point strongly suggests their intent to withhold treatment.

91.     For example, A.S., an inmate at Freemont Correctional Facility, attempted to hire a private SOTMP-approved treatment provider to come to the facility and provide him with private, on-site treatment. Defendants refused to permit this. At first, citing AR 700-21, Defendants argued that the regulation prohibited offenders from receiving treatment from outside providers. After A.S. obtained a court order allowing the treatment, Defendants still resisted, claiming at various times that (1) A.S. needed to sign a release of information, unprotected by HIPAA, (2) that the facility's physical accommodations would not adequately protect his confidentiality were he to meet with the provider, (3) the provider would need to be escorted to a confidential mental health office, regardless of whether A.S. waived his right to confidentiality, and (4) the provider would need to visit A.S. monthly and, in turn, have to complete a DOC academy to obtain a "volunteer badge." Once all these unnecessary and onerous burdens were met, A.S. was able to schedule visits with the provider, only to be told just days in advance that the facility no longer had the space for him to meet with her. Without the treatment, A.S. was, unsurprisingly, denied parole.

92.     The location of the facilities presents yet another unnecessary obstacle. By design, most DOC prisons are in remote or rural areas without sizable populations of qualified mental healthcare professionals to choose from. As a result, the pool of potential treatment providers is unnecessarily and arbitrarily limited to a few small communities scattered across Colorado. Few of these jurisdictions even have local community SOMB providers. For instance, both the SOMB's 2024 *Treatment Solutions Work Group Report* and 2023 DOC's 2023 *Lifetime*

*Supervision of Sex Offenders Annual Report* recognize that most offenders were in the Fremont Correctional Facility, but most of the approved treatment providers were in the Denver Metro Area.

93.     Furthermore, both the SOMB's 2024 *Treatment Solutions Work Group Report* and DOC's 2023 *Lifetime Supervision of Sex Offenders Annual Report* acknowledge that most scientific studies conclude that teletherapy is effective and at least equivalent to conventional face-to-face modality in terms of clinical assessments and treatment outcomes. In fact, the SOMB *Adult Standards and Guidelines for the Assessment, Evaluation, Treatment and Behavioral Monitoring of Adult Sex Offenders*, "Appendix U: Use of Tele-Therapy with Adult Sex Offenders" explicitly authorizes the use of teletherapy. (Nov. 2023 Update), https://dcj.colorado.gov/sites/dcj/files/documents/branded_adult_standards_november_2023.pdf. Yet DOC will not permit teletherapy as a form of treatment.

### L.     DOC's Refusal to Address the Problem

94.     In 2016, the Colorado Office of the State Auditor produced a Performance Audit of DOC's Behavioral Health Programs, which addressed DOC's implementation of a prior 2013 evaluation providing recommendations for a restructuring of the Sex Offender Program. The audit found that "the Department has not established effective controls to ensure that sex offenders are adequately assessed and prioritized for treatment, and has not increased the number of sex offenders it enrolls in treatment annually." Colo. Office of the State Auditor, *Behavioral Health Programs,* 96 (2016), https://leg.colorado.gov/sites/default/files/documents/audits/1556p_behavioral_health_programs_1.pdf.

95.     The audit concluded that DOC's failure to provide treatment to sex offenders resulted in high-risk offenders with determinate sentences being released back into the community without treatment, offenders with SOLSA sentences remaining in prison indefinitely, and increased costs to the state.

96.     Specifically, the audit found that *at the time*: Considering that a single offender costs about $36,000 per year to incarcerate and there are 1,231 offenders on the GRL who have passed their parole eligibility date, the annual cost to the State could be as much as $44 million each year that these offenders continue to be incarcerated. In FY23, DOC estimated inmate incarceration costs at $56,766 per year per inmate.

97.     Similarly, in 2017, another audit of DOC included an entire section titled *Offenders with Lifetime Supervision Sentences Remaining in Prison Indefinitely*, which detailed the extraordinary waitlist to obtain treatment services, even though many low-risk offenders, like Plaintiffs, can effectively and safely be managed and treated in the community.

98.     The failure or refusal to provide treatment is an ongoing problem which has not been (and is not being) addressed, as shown by the annual totals of individuals participating in or awaiting treatment:

| Year | Individuals Serving Indeterminate Sentences In Treatment | Individuals Serving Indeterminate Sentences on the GRL Awaiting Treatment |
| --- | --- | --- |
| 2017 | 457 | 402 |
| 2018 | 440 | 364 |

| | | |
|---|---|---|
| 2019 | 524 | 358 |
| 2020 | 485 | 325 |
| 2021 | 239 | 328 |
| 2022 | 242 | 320 |
| 2023 | 216 | 332 |

99.     Even so, these numbers are not completely transparent. If individuals in "Maintenance"—*i.e.,* those who had completed SOTMP treatment—were subtracted from these totals, only 107 inmates serving indeterminate sentences were actively enrolled in SOTMP. As of March 8, 2024, DOC reported 420 inmates on the GRL who are serving indeterminate sentences.

100.     These numbers also show that even though the GRL remains static, the number of individuals in treatment serving indeterminate sentences has plummeted in the past seven years.

101.     Over the same period, DOC's budget for the assessment, treatment, and testing of sex offenders has decreased, from a 2017 high of $4,236,895, to $3,812,125 in 2023. Moreover, hundreds of other SOLSA-sentenced inmates are not even on the GRL but will join it, *e.g.,* as soon as they come within four years of their parole eligibility date. In other words, the GRL is an arbitrarily and artificially reduced representation of SOLSA's demand for SOTMP resources within the DOC.

102.     Again, the SOMB has failed to acknowledge, let alone address, this problem. For instance, in the SOMB's 2024 *Treatment Solutions Work Group Report* and DOC's 2023 *Lifetime Supervision of Sex Offenders Annual Report*, there is no reference to the effective life sentences many offenders placed on the GRL are experiencing.

## VI.    FEDERAL RULE OF CIVIL PROCEDURE 23 CLASS ACTION ALLEGATIONS

### A.    Class Definition

103.     This is a class action pursuant to Federal Rule of Civil Procedure 23, brought by Plaintiffs on behalf of a Proposed Class of similarly situated individuals. The Proposed Class (subject to future revision as may be necessary), is defined as follows:

104.     All inmates with indeterminate sentences under SOLSA who are coded S5-R, who are past their parole eligibility date, and who have been denied access to SOTMP treatment.

105.     The unlawful conduct suffered by Plaintiffs and the members of the Proposed Class includes, but is not limited to:

    a.      Being required to receive treatment;

    b.      Being willing and eligible to receive treatment;

    c.      But not getting treatment;

    d.      And, therefore, not getting paroled despite being otherwise eligible.

106.     Upon information and belief, the Proposed Class contains more than 180 members.

107.     Plaintiffs and the Proposed Class have standing to seek such relief because of the adverse effects that Defendants' unlawful patterns, practices, and/or policies have had on them individually and generally.

108.     The patterns, practices, and/or policies described in this Complaint prove that failure to abide by SOLSA requirements is a feature of, and not a bug in, Defendants' standard operating patterns, practices, and/or policies.

**B.     Numerosity and Impracticality of Joinder**

109.     The members of the Proposed Class are sufficiently numerous to make joinder of their claims impracticable.

110.     Upon information and belief, there are more than 180 current members of the Proposed Class who have experienced the conduct described herein.

111.     Although determination of the precise number of Proposed Class members may be subject to change, it is significant and satisfies the numerosity requirement of Fed. R. Civ. P. 23(a).

**C.     Common Questions of Law and Fact**

112.     The claims alleged on behalf of Plaintiffs and the Proposed Class raise questions of law and fact common to Plaintiffs and all Proposed Class members. Among these questions are:

a.     Whether members of the Proposed Class have been arbitrarily denied treatment required by law;

b.     Whether Defendants violated contractual agreements in which certain members of the class agreed to plead guilty in exchange for a sentence that included the promise of timely access to the treatment necessary to be eligible for parole by the time of their parole eligibility date.

113.     Thus, the common question requirement of Fed. R. Civ. P. 23(a) is satisfied.

**D.      Typicality of Claims and Relief Sought**

114.     Plaintiffs are members of the Proposed Class they seek to represent. Plaintiffs' claims are typical of the claims of the Proposed Class in that they all arise from the same unlawful patterns, practices, and/or policies of Defendants, and are based on the legal theory that these patterns, practices, and/or policies violate legal rights.

115.     Plaintiffs and the members of the Proposed Class allege that they are the victims of unlawful treatment based on their status as sex offenders with indeterminate sentences.

116.     The relief that Plaintiffs seek as a result of Defendants' unlawful patterns, practices, and/or policies is typical of the relief which is sought on behalf of the Proposed Class.

117.     Thus, the typicality requirement of Fed. R. Civ. P. 23(a) is satisfied.

**E.      Adequacy of Representation**

118.     The interests of Plaintiffs are co-extensive with those of the Proposed Class they seek to represent.

119.     Plaintiffs are willing and able to represent the Proposed Class fairly and vigorously as they pursue their similar individual claims.

120.     Plaintiffs have retained counsel who are qualified and experienced in class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

121.     The combined interests, experience, and resources of Plaintiffs and their counsel to competently litigate the individual and class claims here satisfy the adequacy of representation requirement of Fed. R. Civ. P. 23(a).

F.      **Requirements of Federal Rule of Civil Procedure 23(b)(1)**

122.    Without class certification, the same evidence and issues would be subject to relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

123.    All evidence of Defendants' patterns, practices, and/or policies and whether they are in violation of the law would be exchanged and litigated repeatedly.

124.    Accordingly, certification of the Proposed Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff, the Proposed Class, and Defendants.

G.      **Requirements of Federal Rule of Civil Procedure 23(b)(2)**

125.    Defendants have acted on grounds, described herein, generally applicable to Plaintiffs and the members of the Proposed Class, by adopting and following systemic patterns, practices, and/or policies that arbitrarily deprive the constitutional rights of the Proposed Class.

126.    The deprivation of these constitutionally protected rights is fostered by Defendants' standard patterns, practices, and/or policies, is not sporadic or isolated, and supports the request for final injunctive and declaratory relief with respect to Plaintiffs and the Proposed Class as a whole.

127.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact about systemic deprivation of rights against the Proposed Class.

128.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs and the Class Members' entitlement to monetary and non-monetary remedies for individual

losses caused by, and exemplary purposes necessitated by, such deprivation of constitutional rights.

129.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

**H.    Requirements of Federal Rule of Civil Procedure 23(b)(3)**

130.    The common issues of fact and law affecting Plaintiffs' claims and those of the Proposed Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

131.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiff's claims and the claims of the Proposed Class.

132.    The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of the Proposed Class, as well as the common questions of law and fact described above.

133.    DOC has a pattern and practice of providing treatment to inmates who file lawsuits against DOC alleging similar claims to those brought here only after the denial of DOC's predictable Fed. R. Civ. P. 12(b) motions. Once the lawsuit is at issue, DOC moves the lucky litigant to the top of the GRL, making the claims moot.

134.    DOC avoids litigation and discovery into its arbitrary and capricious practices and delays addressing any meaningful, systemic solution to the problem. DOC's strategy makes it impractical for the members of the Proposed Class to pursue their claims individually. Likewise, the cost of proving Defendants' pattern and practice of deprivation of constitutional rights makes it impracticable for the members of the Proposed Class to pursue their claims individually.

**VII.   CAUSES OF ACTION**

**First Claim for Relief under 42 U.S.C. § 1983**

**On Behalf of All Plaintiffs**

**Against All Defendants**

**(Fourteenth Amendment Violation—Procedural Due Process)**

135.    Plaintiffs and the Proposed Class reaffirm and incorporate by reference the prior paragraphs, as well as the Introduction and Background sections of this Complaint.

136.    SOLSA creates a protected liberty interest in an inmate receiving sex offender treatment because it mandates treatment coextensive with incarceration, assumes access to SOTMP treatment prior to one's Parole Eligibility Date such that they can be meaningfully considered for parole at that time, and conditions parole eligibility on one having SOTMP.

137.    Under the Fourteenth Amendment to the United States Constitution, Plaintiffs and the Proposed Class may not be deprived of their protected liberty interests without due process of law.

138.    Defendants violated Plaintiffs' and the Proposed Class's protected liberty interests by depriving them of the opportunity to participate in mandatory SOTMP treatment without notice, without an opportunity to contest the deprivation of treatment, and without meaningful periodic review of their deprivation of treatment.

139.    Plaintiffs and the Proposed Class have experienced significant harms as a direct and proximate result of Defendants' failure to provide them with sufficient process regarding the deprivation of the treatment described herein, because their sentences have effectively been converted into life sentences without an opportunity for parole.

40

140.     Plaintiffs and the Proposed Class will continue to experience significant harms from Defendants' conduct absent a grant of the declaratory and injunctive relief requested herein.

**Second Claim for Relief under 42 U.S.C. § 1983**

**On Behalf of All Plaintiffs**

**Against All Defendants**

**(Fourteenth Amendment Violation—Substantive Due Process)**

141.     Plaintiffs and the Proposed Class reaffirm and incorporate by reference the prior paragraphs, as well as the Introduction and Background sections of this Complaint.

142.     SOLSA creates a protected liberty interest in an inmate receiving sex offender treatment because it mandates treatment coextensive with incarceration, assumes access to SOTMP treatment prior to one's Parole Eligibility Date, and conditions parole eligibility on one having successfully completed SOTMP.

143.     Under the Fourteenth Amendment to the United States Constitution, Plaintiffs and the Proposed Class may not be deprived of their protected liberty interests without due process.

144.     Defendants have violated Plaintiffs' and the Proposed Class's protected liberty interests under the Fourteenth Amendment by arbitrarily depriving them of access to sex offender treatment in contravention of SOLSA and without any legitimate penological justification.

145.     Defendants violated Plaintiffs and the Proposed Class's protected liberty interests under the Fourteenth Amendment by knowingly and willfully implementing and enforcing a policy and actual practice of arbitrarily depriving some offenders of statutorily-mandated

treatment despite actual knowledge that such deprivation will make the offender ineligible for parole—causing the offender to unnecessarily languish in prison indefinitely.

146.    Defendants have implemented and enforced this policy and actual practice for years and have deliberately and indifferently continued to arbitrarily deprive Plaintiffs and the Proposed Class of treatment despite their authority and ability to resolve these ongoing violations under the Fourteenth Amendment.

147.    As a direct and proximate result of Defendants' deliberate indifference toward providing Plaintiffs and the Proposed Class with the opportunity to participate in treatment, Plaintiffs and the Proposed Class have suffered significant harms.

148.    Plaintiffs and the Proposed Class will continue to experience significant harms from Defendants' conduct absent a grant of the declaratory and injunctive relief requested herein.

### Third Claim for Relief under 42 U.S.C. § 1983
### On Behalf of Mr. Gambrell and Mr. Hinkle and All Similarly Situated Plaintiffs
### Against All Defendants
### (Breach of Plea Agreement in Violation of the Fourteenth Amendment)

149.    Plaintiffs and the Proposed Class reaffirm and incorporate by reference the prior paragraphs, as well as the Introduction and Background sections of this Complaint.

150.    Mr. Gambrell initially entered a plea of not guilty and then engaged in plea discussions with the State. Throughout that negotiation process, and like other members of the Proposed Class, Mr. Gambrell entered into a contractual guilty plea agreement with the State.

151.    Mr. Gambrell agreed to plead guilty to sexual assault on a child, in exchange for waiving his right to a jury trial and receiving a (theoretically) shorter sentence under SOLSA. In

expressly offering Mr. Gambrell a SOLSA sentence, the State guaranteed and promised to provide him with, timely and coextensive with incarceration, the offense-specific treatment necessary to become eligible for parole. And Mr. Gambrell understood that by complying with the rules of the DOC and progressing in SOTMP that he would, at a minimum, become eligible for parole before his parole eligibility date.

152.    Mr. Gambrell was willing to forgo other options to resolve his criminal case, including his right to trial by jury, for the opportunity to be eligible for parole at an earlier date afforded by his plea agreement with the State.

153.    Mr. Gambrell completed his part of the bargain. On November 1, 2019, he entered the guilty plea, and on March 6, 2020, he was sentenced to four-years-to-life under the SOLSA sentencing scheme.

154.    Mr. Gambrell's parole eligibility date was October 25, 2022.

155.    Mr. Gambrell has repeatedly requested treatment.

156.    Defendants denied these requests by refusing to provide Mr. Gambrell with SOTMP treatment in a timely and meaningful manner. In so doing, Defendants breached their contract with Mr. Gambrell and other members of the Proposed Class.

157.    Mr. Hinkle initially entered a plea of not guilty and then engaged in plea discussions with the State. Throughout that negotiation process, and like other members of the Proposed Class, Mr. Hinkle entered into a contractual guilty plea agreement with the State.

158.    Mr. Hinkle agreed to plead guilty to sexual assault on a child, position of trust, victim 15-18, in exchange for waiving his right to a jury trial and receiving a (theoretically) shorter sentence under SOLSA. In expressly offering Mr. Hinkle a SOLSA sentence, the State

43

guaranteed and promised to provide him with, timely and coextensive with incarceration, the offense-specific treatment necessary to become eligible for parole. And Mr. Hinkle understood that by complying with the rules of the DOC and progressing in SOTMP that he would, at a minimum, become eligible for parole before his parole eligibility date.

159.    Mr. Hinkle was willing to forgo other options to resolve his criminal case, including his right to trial by jury, for the opportunity to be eligible for parole at an earlier date afforded by his plea agreement with the State.

160.    Mr. Hinkle completed his part of the bargain. On July 13, 2021, he entered the guilty plea, and on November 23, 2021, he was sentenced to two-years-to-life under the SOLSA sentencing scheme.

161.    Mr. Hinkle's parole eligibility date was September 10, 2022.

162.    Mr. Hinkle has repeatedly requested treatment.

163.    Defendants denied these requests by refusing to provide Mr. Hinkle with SOTMP treatment in a timely and meaningful manner. In so doing, Defendants breached their contract with Mr. Hinkle and other members of the Proposed Class.

164.    Plaintiffs and the Proposed Class have substantive and procedural due process rights under the Fourteenth Amendment to the U.S. Constitution that allow them the ability to enforce the terms of their plea agreements. *Burnett v. Fallin*, 754 F. App'x 696, 704 (10th Cir. 2018) ("If the government breaches express or implied terms of a plea agreement, a violation of due process occurs." (citation omitted)). Indeed, specific performance of a plea agreement is a constitutional right clearly established in *Santobello v. New York*, 404 U.S. 257, 262 (1971) (holding that "the interests of justice" entitle individuals to seek specific performance of a plea

44

agreement following the government's breach), and therefore this claim is cognizable. *Allen v. Hadden*, 57 F.3d 1529, 1534 (10th Cir. 1995) ("Plea bargains, like contracts, cannot normally be unilaterally broken with impunity or without consequences." (citation omitted)).

165.    Plaintiffs and certain other members of the Proposed Class entered plea agreements in which the State promised to provide treatment necessary for parole in exchange for Plaintiffs' guilty pleas.

166.    Plaintiffs relied on the State's promise that once Plaintiffs made progress in treatment, they would be eligible for parole. On that basis, Plaintiffs and other members of the Proposed Class accepted these plea agreements.

167.    The state violated these agreements by not offering timely treatment and/or refusing to provide treatment altogether. The breach of these agreements by the State violates Plaintiffs' rights to due process guaranteed under the Fourteenth Amendment to the U.S. Constitution.

168.    Moreover, Defendants' contractual obligation to provide treatment is continuing and any limitations period runs anew with each breach. *Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co.*, 664 F.2d 252, 256 (10th Cir. 1981).

169.    To remedy this breach, Mr. Hinkle and other members of the Proposed Class request specific performance of their agreement with the State— that they be immediately provided with the treatment necessary to their eligibility for parole.

## VIII.   PRAYER FOR RELIEF

170.    For these reasons, Plaintiffs respectfully request that Defendants be cited to appear and answer, and that the Court enter judgment against Defendants, including, but not limited to:

### Declaratory Judgment

171.    Plaintiffs and the Proposed Class reaffirm and incorporate by reference the prior paragraphs, as well as the Introduction and Background sections of this Complaint.

172.    Plaintiffs request that the Court enter an Order determining that:

a.      They have a protected liberty interest in receiving sex offender treatment;

b.      Defendants have unlawfully deprived Plaintiffs of their substantive and procedural rights to due process; and

c.      Plaintiffs have suffered significant harm from Defendants' conduct.

### Injunctive Relief

173.    Plaintiff and the Proposed Class reaffirm and incorporate by reference the prior paragraphs, as well as the Introduction and Background sections of this Complaint.

174.    Plaintiffs request that the Court enter an order for permanent injunctive relief requiring Defendants and their officers to provide treatment as statutorily required, permit virtual treatment and/or relocation to a metro area to receive treatment, permit Plaintiffs to receive treatment from privately retained therapists, prioritize providing treatment to individuals serving indeterminate sentences past their PED, and to maintain a transparent and reliable GRL.

### Other Relief

175.    Plaintiffs also request that the Court award:

a.      Actual and special damages against Defendants in an amount to be proven at trial;

b.      Attorney's fees and costs;

c.      Prejudgment and post-judgment interest; and

d.      Such other relief, both general and special, to which Plaintiffs may have a right to receive.

Dated: July 2, 2024.

Respectfully submitted,

*s/ Jeffrey S. Pagliuca*

Jeffrey S. Pagliuca, #12462
Adam Mueller, #42176
HADDON, MORGAN AND FOREMAN, P.C.
950 17th Street, Suite 1000
Denver, CO 80202
Phone: 303.831.7364
Fax: 303.832.2628
jpagliuca@hmflaw.com
amueller@hmflaw.com

Kelly L. Page, #46344
David M. Beller, #35767
RECHT KORNFELD, P.C.
1600 Stout Street, Suite 1400
Denver, CO 80202
Phone: 303.573.1900
Fax: 303.446.9400
kelly@rklawpc.com
david@rklawpc.com

*Attorneys for Plaintiffs*